Kirk D. Dillman (SBN 110486)
kdillman@McKoolSmith.com
Alan P. Block (SBN 143783)
ablock@McKoolSmith.com
**McKool Smith, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:    (213) 694-1200
Facsimile:    (213) 694-1234

Steven Rizzi (admitted *pro hac vice*)
srizzi@mckoolsmith.com
Emily B. Tate (admitted *pro hac vice*)
etate@McKoolSmith.com
**McKool Smith, P.C.**
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001-8603
Telephone:    (212) 402-9400
Facsimile:    (212) 402-9444

Ramy E. Hanna (admitted *pro hac vice*)
rhanna@McKoolSmith.com
**McKool Smith, P.C.**
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone:    (713) 485-7300
Facsimile:    (713) 485-7344

**Attorneys for Defendant
BROADCOM CORPORATION**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEKSANDAR KAVCIC, PH.D.,<br><br>                                    Plaintiff,<br><br>        v.<br><br>BROADCOM CORPORATION,<br><br>                                    Defendant. | Case No. 20-cv-01246-JD<br><br>**DEFENDANT BROADCOM'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

Introduction ........................................................................................................................1

Statement of Material Facts in Dispute .............................................................................2

Argument ..........................................................................................................................12

I.      Standard for Summary Judgment ..........................................................................12

II.     Summary Judgment Should Be Denied Because There Are Facual Disputes as to
        Whether Dr. Kavcic Breached His Obligations Under the Letter Agreement ......13

        A.      There are Genuine Issues of Material Fact as to Whether Dr. Kavcic Breached
                His Confidentiality Obligations by Disclosing or Using LSI Confidential
                Information in Violation of the Letter Agreement .....................................13

        B.      Summary Judgment Should be Denied Because Dr. Kavcic Breached the Covenant
                Not to Compete ..........................................................................................15

III.    Summary Judgment Should Be Denied Because Plaintiff Breached the Covenant Of Good
        Faith and Fair Dealing. ..........................................................................................16

Conclusion ........................................................................................................................17

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-Tek Mech., Inc. v. KHW Servs., Inc.*,
No. 3:21-CV-01974-H-WVG, 2022 WL 3044815 (S.D. Cal. Aug. 2, 2022)..........................17

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................................12

*Bladeroom Grp. Ltd. v. Emerson Elec. Co.*,
No. 5:15-CV-01370-EJD, 2018 WL 2021884 (N.D. Cal. May 1, 2018)..............................13

*Brooks v. Excellence Mortg., Ltd.*,
486 S.W.3d 29 (Tex. App. 2015)......................................................................................13

*Bumpus v. Realogy Brokerage Group LLC*,
3:19-CV-03309-JD, 2022 WL 1489470
(N.D. Cal. May 11, 2022) (Donato, J.)............................................................................12

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
Civil Action No. 09-290 (W.D. Pa. Mar. 31, 2014) .........................................................3

*Godo Kaisha IP Bridge 1 v. Telefonaktiebolaget LM Ericsson*,
2:21- CV-00213-JRG [Dkt. No. 79] ................................................................................15

*Hewlett-Packard Co. v. EMC Corp.*,
330 F. Supp.2d 1087 (N.D. Cal. 2004) ...........................................................................14

*Carnegie Mellon University v. LSI Corp. et al.*,
Case No. 3:18-cv-04571-JD (N.D. Cal.)........................................................... *passim*

*Koehrer v. Superior Court*,
181 Cal. App. 3d 1155, 226 Cal. Rptr. 820 (Cal. App. 4th Dist. 1986)...................16

*Mayer v. Dell*,
139 F.R.D. 1 (D.D.C.1991)...............................................................................................14

*McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*,
138 S.W.3d 24 (Tex. App. San Antonio 2004).................................................................13

*Nike, Inc. v. Adidas Am. Inc.*,
9:06-CV-43, 2006 WL 5111106 (E.D. Tex. Sept. 29, 2006).................................................15

*Oracle Corp. v. DrugLogic, Inc.*,
No. C-11-00910 JCS, 2012 WL 2244305 (N.D. Cal. June 15, 2012) .....................................14

*Pasadena Live v. City of Pasadena,*
    114 Cal. App. 4th 1089 (Cal. App. 2d Dist. 2004) ................................................16

*Paul v. Rawlings Sporting Goods Co.,*
    123 F.R.D. 271 (S.D. Ohio 1988) ........................................................................14

*Pellerin v. Honeywell Intern. Inc.,*
    2012 WL 112539 (S.D. Cal. Jan.12, 2012)............................................................15

*Racine & Laramie, Ltd. v. Department of Parks & Recreation*
    11 Cal. App. 4th 1026 (1992) ...............................................................................16

*Regents of the University of Minnesota v. LSI Corp., et al.,*
    Case No. 16-cv-02891 (D. Minn.) ............................................................... *passim*

*Wall St. Network, Ltd. v. New York Times Co.,*
    164 Cal. App. 4th 1171 (2008) .............................................................................13

**Other Authorities**

Fed. R. Civ. P. 56(a)................................................................................................12

The Court should deny Dr. Kavcic's motion for summary judgment. Dr. Kavcic filed this lawsuit seeking a declaratory judgment that he has not breached a 2016 litigation consulting agreement with Broadcom (the "Letter Agreement") concerning a patent case originally filed in the District of Minnesota, *Regents of the University of Minnesota v. LSI Corp., et al.*, Case No. 16-cv-02891 (D. Minn.) (the "UMN Litigation"). In response, Broadcom counterclaimed for breach of the Letter Agreement due to his role as a litigation consultant for CMU and its counsel, K & L Gates LLP, *in Carnegie Mellon University v. LSI Corp. et al.*, Case No. 3:18-cv-04571-JD (N.D. Cal.) (the "CMU Litigation"). K & L Gates is also counsel to UMN in the UMN Litigation, which is pending before Judge Edward J. Davila and presently in discovery. Broadcom also alleged that by assisting CMU in the CMU Litigation, Dr. Kavcic had breached the implied covenant of good faith and fair dealing under the Letter Agreement.

The CMU and UMN Litigations involve the same accused products, hard disk drive ("HDD") controllers, and more specifically, the "read channel" functionality of such controllers. Dr. Kavcic worked directly with LSI's litigation counsel defending the UMN litigation after executing the Letter Agreement acknowledging his confidentiality obligations to LSI. He further agreed not to assist another party seeking to license patents to LSI involving the same technology, so as to guard against potential inadvertent misuse or disclosure of LSI's privileged and/or confidential information.

On July 27, 2023, months after this action was scheduled for trial and after two virtually identical Motions for Judgment on the Pleadings, Plaintiff filed a Motion for Summary Judgment seeking "judgment for Dr. Kavcic on all claims." Pl. Br. at 2. Though the motion is nebulous and does not address Broadcom's other counterclaim that Dr. Kavcic violated his covenant of good faith and fair dealing, Dr. Kavcic appears to seek relief for that claim as well. Regardless, the motion goes well beyond the scope of issues the Court granted Dr. Kavcic leave to address at summary judgment—namely what the Letter Agreement says.[1]

---

[1] Tate Decl., Ex. A, at 12:14-20. The parties stipulated at the July 20, 2023, status conference that the Letter Agreement is binding. Tate Decl., Ex. A, at 12:21-13:2. In the Complaint and prior filings, Dr. Kavcic argued that the non-compete provision of the Letter Agreement was not

Even if the Court considers Dr. Kavcic's improper motion, summary judgment is not appropriate. Dr. Kavcic's own complaint admits that he served as a litigation consultant to CMU's counsel in the CMU Litigation. Discovery has only bolstered the likelihood that Broadcom will prevail at trial. The facts discussed herein, which Broadcom supports with evidence, shed additional light on the scope of Dr. Kavcic's assistance to CMU and demonstrates Dr. Kavcic's violation of his covenant of good faith and fair dealing. At a minimum, there exists a material dispute of fact as to whether Dr. Kavcic is in breach, and summary judgment for Dr. Kavcic is therefore not warranted.

## **STATEMENT OF MATERIAL FACTS IN DISPUTE[2]**

The facts set forth herein bear on various issues raised in Dr. Kavcic's motion, including the law governing the Letter Agreement, confidential and privileged information conveyed to Dr. Kavcic under that agreement, the substantial overlap in the technology at issue in the UMN and CMU Litigations, Dr. Kavcic's motivation for entering into the Letter Agreement, and other experts available to CMU that are admittedly qualified to "defend" the CMU patents in the CMU Litigation.

    (1)    Dr. Kavcic is a named co-inventor of U.S. Patent Nos. 6,201,839 and 6,438,180 ("CMU Patents"). The CMU Patents are directed to high density magnetic recording sequence detectors. CMU, where Dr. Kavcic was a Ph.D. student at the time of the work described in the patents, is the owner of the CMU Patents. Ex. JTX21.[3]

---

enforceable under California law. *See, e.g.*, Plaintiff's Trial Brief, at Section C (Dkt. 122) (Apr. 13, 2023) ("California Law Prohibits Broadcom's Interpretation of the Letter Agreement."); Plaintiff's Motion for Judgement [sic] on the Pleadings, at Section B (Dkt. 108) (Feb. 4, 2023) ("If Paragraph 8 of the Letter Agreement is Interpreted to Prohibit Dr. Kavcic from Assisting CMU with Litigation, then as a Matter of Law, that Provision is Void Under California Law"); Complaint, at 11 (Dkt. 1) (Feb. 13, 2020) ("Plaintiff, Aleksandar Kavcic, prays that this Court declare the rights of the parties and that it enter judgment declaring that . . . [t]he Letter Agreement is unenforceable." In light of Dr. Kavcic's recent agreement as to the binding nature of the agreement, this issue is moot.

[2] Herein is a recital of Broadcom's proposed facts from the Parties' Joint Pretrial Statement, to which Dr. Kavcic would not stipulate.

[3] All exhibit numbers refer to the Tate Declaration. For the Court's convenience, Defendant uses the "JTX" and "DTX" exhibit identifiers included in the Joint Pretrial Statement. Joint Exhibits, Dkt. 124-7. Each of the cited exhibits is attached to the accompanying declaration of Emily B.

1    (2)    In August 2016, Dr. Kavcic was a resident of the state of Hawaii, where he was
2           employed as a professor with the University of Hawaii.  Ex. JTX84 at 15-16.
3    (3)    Dr. Kavcic has been a resident of the state of Texas since prior to at least November
4           5, 2016.   Ex. JTX84 at 22.
5    (4)    Dr. Kavcic has never been a resident of the state of California, has no real property in
6           California, no bank accounts in California, has never been employed by any employer
7           within California, and has no other business or financial ties with California.  Ex.
8           JTX85 7-8.
9    (5)    By August 2016, Dr. Kavcic was aware that he would be receiving a substantial
10          payment from a settlement reached between Carnegie Mellon University and Marvell.
11          Ex. JTX84 at 17.  The lawsuit, *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
12          Civil Action No. 09-290 (W.D. Pa. Mar. 31, 2014), alleged infringement of the same
13          CMU Patents (the "Marvell Litigation").
14   (6)    ███████████████████████████████████████████████████████████████
15          █████████████████████████

16   **Dr. Kavcic's Interactions with LSI Prior to the UMN Litigation**

17   (7)    Between 2007 and 2016, Dr. Kavcic gave a number of talks and presentations to LSI.
18          Ex. JTX84 at 80.
19   (8)    Dr. Kavcic also maintained regular contact during this time with a former student, Dr.
20          Shaohua Yang, who was employed at LSI.  Ex. JTX85 at 21; Ex. JTX84 at 19.
21   (9)    Throughout his regular contact with LSI, Dr. Kavcic did not notify LSI of his belief
22          that LSI was making use of the CMU Patents, or that CMU intended to sue LSI for
23          infringement of the CMU Patents.

24   **The UMN Litigation**

25   (10)   On August 25, 2016, the University of Minnesota filed suit for patent infringement
26          against LSI and Avago Technologies U.S. Inc. ("Avago") and commenced the UMN

27   _____

28   Tate.

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Litigation. The patent-in-suit is U.S. Patent No. 5,859,601 (the "'601 patent"). Ex. JTX7.

(11)    UMN is represented in the UMN Litigation by the law firm K & L Gates LLP ("K & L Gates"), including Anna Shabalov, Christopher Verdini, Mark G. Knedeisen, Patrick J. McElhinny, and Theodore J. Angelis.

(12)    The Accused Products in the UMN Litigation are LSI HDD chips, including HDD controller systems-on-a-chip and/or stand-alone read channel chips. Ex. JTX86.

(13)    When Dr. Kavcic learned of the UMN Litigation, he contacted Dr. Shaohua Yang at LSI to discuss the UMN Litigation. Ex. JTX85 at 21-22; Ex. JTX84 at 19-20. Dr. Kavcic was aware at the time that K & L Gates represents UMN in the UMN Litigation. Ex. JTX85 at 111.

(14)    Shortly thereafter, Dr. Kavcic began work as a consultant, assisting LSI in its defense of the UMN Litigation. Ex. JTX84 at 20.

(15)    On November 21, 2016, Broadcom and Dr. Kavcic signed the Letter Agreement governing the terms of Dr. Kavcic's consultation with Broadcom on the UMN Litigation. The Letter Agreement was in effect from November 21, 2016 through December 4, 2019, when Dr. Kavcic terminated it. Ex. JTX1; Ex. DTX3.

The Letter Agreement is addressed to Dr. Kavcic and states, in relevant part:

> "Your work on behalf of Broadcom is confidential and may be protected under the attorney-client privilege, the litigation work product doctrine, or other applicable protections/privileges. You agree that the protections/privileges associated with such information belong to Broadcom and that you will not disclose or use such information provided or created pursuant to this Letter Agreement or any work done under this Letter Agreement … You must treat your work as confidential and may not disclose it orally or in writing to any third parties without the express, prior written consent of Broadcom …
>
> …
>
> This Letter Agreement confirms that to the best of your knowledge, you have no you have no conflicts with Broadcom or the Regents of the University of Minnesota that would prevent you from assisting Broadcom in this matter. You also agree not to assist, in regards to the subject matter

of this engagement for Broadcom, any other party seeking to manufacture, distribute, or sell products related to the subject matter or covered by any claim of any patent as to which you are providing consulting advice, or any other party seeking to license intellectual property rights associated with this technology, without Broadcom's written consent."

(16)     LSI is represented in the UMN Litigation by the law firm Kilpatrick, Townsend & Stockton LLP ("KTS").  In his role as a litigation consultant to LSI, Dr. Kavcic primarily interfaced with KTS attorney and counsel of record Edward J. Mayle.  Ex. JTX84 at 30-31.

(17)     Edward Mayle is located in Denver, Colorado, and based in KTS's Denver office.

(18)     During Dr. Kavcic's time as a consultant for LSI, Dr. Kavcic and Mr. Mayle exchanged emails and often spoke over the phone.  Ex. JTX85 at 39.

(19)     The UMN Litigation was pending in the District of Minnesota until February 6, 2018, which is after the last date that Dr. Kavcic performed work for LSI under the Letter Agreement according to his records.  Ex. JTX9.

(20)     Dr. Kavcic was paid an hourly rate of $500 for his consulting work in the UMN Litigation, and billed Broadcom for about 24 hours of time spent in November and December 2016.  Ex. JTX1; Ex. JTX88.

(21)     Dr. Kavcic was a resident of the Texas during the entire period of his engagement and performance of services under the Letter Agreement.  Ex. JTX85 at 7.

(22)     In email exchanges on November 19-20, 2016, Mr. Mayle and Dr. Kavcic discussed

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

(23)   In an email to Dr. Kavcic on November 21, 2016, Mr. Mayle discussed ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████

(24)   Since the Marvell Litigation, other than his work with Broadcom under the Letter Agreement, Dr. Kavcic has not performed any litigation consulting for any entity other than CMU and has no plans to do so in the future.  Ex. JTX85 at 16.

**The CMU Litigation**

(25)   On July 27, 2018, CMU filed suit against LSI and Broadcom in the Northern District of California for alleged past infringement of the CMU Patents, commencing the CMU Litigation.

(26)   CMU is represented in the CMU Litigation by the law firm K & L Gates LLP ("K & L Gates"), including Anna Shabalov, Christopher Verdini, Mark G. Knedeisen, Patrick J. McElhinny, and Theodore J. Angelis.   Ex. JTX87.

(27)   Dr. Kavcic had communications with K & L Gates regarding LSI's potential infringement of the CMU patents at least as early as February 17, 2016.  Ex. DTX2.

1   (28)   In a privilege log produced by CMU in this litigation, CMU noted in its privilege

2          summary ten emails regarding "CMU/LSI litigation" that predate Dr. Kavcic's

3          engagement with LSI in the UMN Litigation, including emails where Dr. Kavcic is

4          the author.  Ex. DTX2.

5   (29)   For example, Dr. Kavcic received four emails on February 17 and February 19, 2016

6          that are summarized as "Email thread prepared in anticipation of litigation and for

7          purposes of seeking and providing legal advice re: CMU/Marvell litigation and

8          potential CMU/LSI litigation."  Ex. DTX2.

9   (30)   Dr. Kavcic received four emails on February 23, March 10, March 11, and March 12,

10         2016 that are summarized as "Email thread prepared in anticipation of litigation and

11         for purposes of seeking and providing legal advice re: potential CMU/LSI litigation."

12         Ex. DTX2.

13  (31)   Dr. Kavcic sent two emails on March 9 and March 11, 2016 that are summarized as

14         "Email thread prepared in anticipation of litigation and for purposes of seeking legal

15         advice re: potential CMU/LSI litigation" and "Email thread prepared in anticipation

16         of litigation and for purposes of seeking and providing legal advice re: potential

17         CMU/LSI litigation," respectively.  Ex. DTX2.

18  (32)   Dr. Kavcic continued to consult with CMU with respect to the CMU Litigation in

19         2017, after he had acted as a litigation consultant for LSI.  Ex. DTX2.

20  (33)   Dr. Kavcic's work with K & L Gates in the CMU /LSI litigation included consulting

21         with respect to patent claim construction.  Ex. JTX85 at 68.

22  (34)   Dr. Kavcic destroyed documents concerning his communications with LSI's counsel

23         pursuant to the Letter Agreement to prevent them from being discovered in the CMU

24         Litigation.  Ex. JTX84 at 34-35.

25  (35)   The CMU Patents expired on April 3, 2018, after Dr. Kavcic began consulting with

26         CMU regarding the CMU Litigation.

(36) Broadcom became aware of Dr. Kavcic's involvement in the CMU Litigation in October 2019, when Dr. Kavcic attended the deposition of LSI's claim construction expert to assist K & L Gates in the questioning. Ex. JTX8.

(37) On October 21, 2019, Broadcom notified Dr. Kavcic that he was in material breach of the Letter Agreement and demanded Dr. Kavcic cease and desist any further assistance to CMU or its attorneys, including K & L Gates. Ex. JTX8.

**Other Experts Retained By or Available To CMU**

(38) The other named co-inventor of the CMU patents is Dr. Jose Moura, a current professor at CMU. Ex. JTX5; Ex. JTX6.

(39) In both the Marvell and CMU Litigations, CMU has retained several other technical experts to assist CMU and its counsel in those cases.

(40) In the Marvell litigation, CMU retained H. Vincent Poor, Christopher Bajorek, Steven McLoughlin, Gilbert Strang, and Thomas A. Day to assist with litigating the CMU Patents. Ex. DTX5; Ex. DTX6; Ex. DTX9; Ex. DTX10; Ex. JTX24.

(41) CMU retained both Christopher Bajorek and Steven McLaughlin to assist in the CMU Litigation. Ex. DTX7; Ex. DTX8.

(42) According to Dr. Kavcic, Dr. Moura and Dr. McLaughlin are both "equipped to defend" the CMU Patents. Ex. JTX85 at 80.

**Subject Matter of the '601, '839, and '180 Patents**

(43) The UMN '601 patent is directed to an "[a]pparatus and method for coding to improve the minimum distance properties of sequence detectors operating at high densities in storage systems." Ex. JTX7 at Abstract.

(44) The UMN '601 patent describes a "maximum transition run (MTR) code" and states that when it is used with "partial response maximum likelihood (PRML) detectors, the bit error rate performance improves significantly over existing combinations of codes and detectors." Ex. JTX7, Abstract.

(45)   The "Field of the Invention" portion of the '601 patent states that "the invention pertains to an improved coding technique involving data recovery channels utilizing sequence detection methods."  Ex. JTX7 at 1:9-12.

(46)   The UMN '601 patent states that "[e]rrors in sequence detectors arise mostly from difficulty in distinguishing minimum distance patterns. . . The performance of sequence detectors such as $E^2$PRML can be improved by coding to remove the patterns that cause minimum distance error events, thereby increasing the minimum distance. This increase in the minimum distance as a result of coding is termed coding gain."  Ex. JTX7 at 2:18-34 ("Background of the Invention".

(47)   The "Summary of the Invention" portion of the '601 patent states that "[w]hen the MTR coding scheme is combined with a certain class of sequence detectors to recover written data in high density recording, the bit-error-rate (BER) performance is improved significantly over existing code/detector combinations."  Ex. JTX7 at 3:3-7 ("Summary of the Invention").

(48)   The "Description of the Preferred Embodiment" portion of the '601 patent states that "[t]o realize the coding gain at the detector output, the detector has to be modified.  In the case of PRML systems, this amounts to removing those states that correspond to the illegal data patterns from a trellis."  Ex. JTX7 at 6:57-58.

(49)   Claim 13 of the '601 patent states:  "A method for encoding m-bit binary datawords into n-bit binary codewords in a recorded waveform, where m and n are preselected positive integers such that n is greater than m, comprising the steps of: receiving binary datawords; and producing sequences of n-bit codewords; imposing a pair of constraints (j;k) on the encoded waveform; generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geqq 2$; and generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform."

1   (50)   Claim 14 of the '601 patent states: "The method as in claim 13 wherein the

2           consecutive transition limit is defined by the equation $2 \leqq j < 10$."

3   (51)   Claim 21 of the '601 patent states:  "The method as in claim 13 wherein the method

4           of receiving data incorporates the removal of certain code-violating patterns from the

5           detection process wherein the detection process comprises at least one of the steps of:

6           removing states and state transitions corresponding to more than j consecutive

7           transitions from a Viterbi trellis; removing branches from a fixed delay tree search

8           corresponding to more than j consecutive transitions; removing branches from a fixed

9           delay tree search corresponding to more than j consecutive transitions when the

10          previous decision is considered part of the sequence; forming boundaries for a signal

11          space formulation such that points in the signal space constellation corresponding to

12          sequences containing more than j consecutive transitions are not considered; and

13          selecting boundaries in a signal space formulation based on a constellation that does

14          not include points corresponding to sequences containing more than j consecutive

15          transitions when the previous decision is considered part of the sequence."

16  (52)   In the UMN Litigation, UMN is asserting claim 14 of the '601 patent.  Ex. JTX86.

17  (53)   The "Field of the Invention" portion of the CMU '839 patent states that "[t]he present

18          invention is directed generally to high density magnetic recording sequence detectors,

19          and, more particularly, to correlation-sensitive sequence detectors."  Ex. JTX5 at 1:20-

20          22.

21  (54)   The "Field of the Invention" portion of the CMU '180 patent states that "[t]she present

22          invention is directed generally to sequence detectors, and, more particularly, to

23          sequence detectors in ISI memory channels."  Ex. JTX6 at 1:20-22.

24  (55)   The CMU patents are directed to "a method of determining branch metric values for

25          branches of a trellis for a Viterbi-like detector."  Ex. JTX5, Abstract).

26  (56)   The "Summary of the Invention" portion of the CMU patents states that "[t]he present

27          invention represents a substantial advance over prior sequence detectors. Because the

28

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

present invention takes into account the correlation between noise samples in the readback signal, the detected data sequence is detected with a higher degree of accuracy."  Ex. JTX5 at 2:24-28; Ex. JTX6 at 2:35-39).

(57)   Claim 4 of the '839 patent recites: "A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising: selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant."

(58)   Claim 1 of the '180 patent recites: "A method of determining branch metric values in a detector, comprising: receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith; selecting a branch metric function at a certain time index; and applying the selected function to the signal samples to determine the metric values."

(59)   Claim 2 of the '180 patent recites: "The method of claim 1, wherein the branch metric function is selected from a set of signal-dependent branch metric functions."

(60)   Claim 5 of the '180 patent recites: "The method of claim 1, wherein the detector is selected from a group consisting of a Viterbi detector, a soft output Viterbi detector, a Generalized Viterbi detector, and a BCJR detector."

(61)   In the CMU Litigation, CMU is asserting infringement of claim 4 of the '839 patent and claim 2 of the '180 patent.  Ex. JTX87.

(62)   The respective complaints in the CMU and UMN Litigations both allege that the asserted patents improve the performance of the read channel in a magnetic HDD, and allow for increased data density.  Ex. JTX86; Ex. JTX87.

(63) According to the CMU Complaint, the CMU Patents "generally claim a method used in a 'read channel' for improving the accuracy of detecting data written to a storage medium, such as a magnetic disk in a hard disk drive ("HDD") thereby substantially improving the performance of the read channel and allowing for increased data density." Ex. JTX87 ¶ 2.

(64) According to the UMN Complaint, the UMN patent "generally claims a method for encoding data to be written to a magnetic disk in a hard disk drive ("HDD") that increases the accuracy with which the data are subsequently read off of those magnetic disks, thereby substantially improving the performance of the HDD and allowing for increased data density." Ex. JTX86 ¶ 2.

(65) In the UMN Litigation, the products accused of infringement are "MTR-enabled Products," which the UMN Complaint defines as "HDD Chips sold under the tradename TrueStore and simulators reading MTR-encoded waveforms." Ex. JTX86 ¶ 69.

(66) In the CMU Litigation, the "Exemplary Accused Products" include "HDD Chips sold under the tradename TrueStore ("Accused Chips") and computer-implemented detectors that execute simulation code files to apply a set of branch metric functions to actual readback signals ("Simulators")." Ex. JTX87 ¶ 79.

(67) The UMN and CMU Complaints include 18 identical or nearly identical paragraphs under "Factual Background." *See* Ex. B, Comparison Table of Complaint Allegations.

## ARGUMENT

## I.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper as a matter of law where there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. *Id.* To determine whether a genuine dispute as to any material fact exists, the Court views the

evidence in the light most favorable to the nonmoving party, and "all justifiable inferences are to be drawn" in that party's favor. *Id.* at 255. A case that is "replete with disputes of material fact" should be permitted to proceed to trial. *Bumpus v. Realogy Brokerage Group LLC*, 3:19-CV-03309-JD, 2022 WL 1489470, at *1 (N.D. Cal. May 11, 2022) (Donato, J.)

## II. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE FACUAL DISPUTES AS TO WHETHER DR. KAVCIC BREACHED HIS OBLIGATIONS UNDER THE LETTER AGREEMENT

### A. There are Genuine Issues of Material Fact as to Whether Dr. Kavcic Breached His Confidentiality Obligations by Disclosing or Using LSI Confidential Information in Violation of the Letter Agreement

The Court should deny summary judgment because the evidence strongly suggests that Dr. Kavcic breached the Letter Agreement by disclosing and/or misusing LSI confidential information.

As a threshold matter, the Letter Agreement is silent as to the choice of law, and the parties dispute whether it is governed by California (Plaintiff) or Texas (Defendant) law. However, there is no material difference in the states' laws concerning the elements of a claim for breach of contract, and thus the Court need not now resolve this dispute. "The elements of a breach of contract claim are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach." *Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29 (Tex. App. 2015) (quoting *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex. App. San Antonio 2004) (internal quotation marks omitted). California law applies a similar four-part test for breach. *Bladeroom Grp. Ltd. v. Emerson Elec. Co.*, No. 5:15-CV-01370-EJD, 2018 WL 2021884, at * 1 (N.D. Cal. May 1, 2018) (citing *Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008)).

The parties do not dispute the existence of the contract or either parties' performance of the contract. Broadcom and Dr. Kavcic had a valid contract, and Broadcom tendered performance of the contract. *See Brooks*, 486 S.W.3d at 36. In consideration for Dr. Kavcic's services on the UMN Litigation, including his agreement to not disclose Broadcom's confidential and/or privileged information, Broadcom paid Dr. Kavcic for about 24 hours of consulting work, at a rate of $500 per hour. Ex. JTX1; Ex. JTX88.

Where the dispute lies is whether Dr. Kavcic received confidential information through his interactions with attorney Mayle and conveyed or misused this information in working with K & L Gates in the CMU/LSI litigation, thereby breaching the Letter Agreement. As the Statement of Material Facts in Dispute demonstrates, there is at least a genuine issue of material fact concerning these points.

### i. Dr. Kavcic Received Confidential Information from Attorney Edward J. Mayle During His Work for LSI

Dr. Kavcic argues for an improperly restrictive interpretation of "confidential information" in arguing that "no confidential information was ever provided to" Dr. Kavcic. D.I. 137 at 8. "Confidential information essentially is information of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege. It could include discussion of the party's strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and weaknesses of each side, the role of each of [the party's] experts to be hired, and anticipated defenses." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp.2d 1087, 1094 (N.D. Cal. 2004) (quoting *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 279 (S.D. Ohio 1988) and *Mayer v. Dell*, 139 F.R.D. 1, 4 (D.D.C.1991)) (internal citations and quotation marks omitted).

Dr. Kavcic learned confidential and privileged information from Mr. Mayle useful to the CMU Litigation, including ███████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. JTX45; Ex. JTX35. For example, through his communications with Mr. Mayle, Dr. Kavcic would have readily concluded ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

ii.     **There is a High Likelihood That Dr. Kavcic Disclosed or Misused**
        ***Confidential LSI Information While Working with Attorneys for CMU and***
        ***UMN***

Dr. Kavcic is also incorrect that LSI must identify specific confidential information that was

disclosed to CMU or K & L Gates to prove a breach. After receiving confidential LSI information,

including litigation strategy, from attorney Mayle, Dr. Kavcic then worked with K & L Gates—

attorneys for both CMU and UMN—while assisting in the CMU Litigation. Courts recognize the

high likelihood that an expert with a prior relationship with an adverse party will inadvertently

disclose or use information gained from that relationship—to the degree that disqualification as an

expert is typically warranted. "Disqualification of an expert is warranted based on a prior

relationship with an adversary if: (1) the adversary had a confidential relationship with the expert

and (2) the adversary disclosed confidential information to the expert that is relevant to the current

litigation." *Hewlett-Packard*, 330 F. Supp.2d at 1092-93; *see Oracle Corp. v. DrugLogic, Inc.*, No.

C-11-00910 JCS, 2012 WL 2244305 (N.D. Cal. June 15, 2012); *Pellerin v. Honeywell Intern. Inc.*,

2012 WL 112539, at *3 (S.D. Cal. Jan.12, 2012).

For a consulting expert like Dr. Kavcic who has received relevant confidential information

concerning the operation of the very same products accused of infringement in the CMU Litigation,

courts find that "the risk is too great" that the expert will "use the information he was given, even if

inadvertently, in some manner that would harm [the adverse party]."[4] *Nike, Inc. v. Adidas Am. Inc.*,

9:06-CV-43, 2006 WL 5111106, at *3 (E.D. Tex. Sept. 29, 2006); *see Godo Kaisha IP Bridge 1 v.*

*Telefonaktiebolaget LM Ericsson*, 2:21- CV-00213-JRG [Dkt. No. 79] 7 (E.D. Tex. Mar. 15, 2022).

In sum, whether Dr. Kavcic disclosed or misused confidential and/or privileged information

gained from his relationship with LSI is a question of fact for the jury to decide.

**B.     Summary Judgment Should be Denied Because Dr. Kavcic Breached the**
        **Covenant Not to Compete**

Dr. Kavcic also breached the covenant not to compete in the Letter Agreement, which he

already stipulated to being bound by, by assisting the attorneys representing CMU and UMN against

---

[4] The risk of misuse of confidential information is compounded because Dr. Kavcic is consulting
with K & L Gates (UMN's lawyers) over the very same products that are at issue in the UMN
litigation where Dr. Kavcic was on Broadcom's consulting expert.

OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Broadcom. Dr. Kavcic argues that assistance to CMU was permissible because once the CMU patents expired, they could no longer be "licensed." But such a construction would effectively render the provision meaningless. Licensing and enforcement of patents go hand-in-hand; the only distinction being timing. The identical act, *e.g.*, sale of a product that practices a patent, can be the subject of both a license, if it occurs after a license agreement has taken effect, and enforcement, if prior to the existence of a license. Moreover, Dr. Kavcic began working with K & L Gates within months of his work for LSI's counsel, and over a year prior to the expiration of the CMU patents. Ex. DTX2 at P-6 – P-16. As such, Dr. Kavcic breached the covenant not to compete because he worked with K & L Gates on the CMU Litigation without Broadcom's express written consent.

In addition, Dr. Kavcic's argument that he did not breach the Letter Agreement because the technology is different in the CMU case is refuted by the UMN patent itself, as set forth above in the Statement of Material Facts in Dispute. The UMN patent includes claims covering combinations of coding and detectors, including a "Viterbi" detector, which is specifically claimed by the asserted patents in the CMU Litigation. Dr. Kavcic's argument is also refuted by the substantial overlap between the complaints filed by K & L Gates in each case. At least 18 of the paragraphs in the CMU Litigation complaint and the UMN Litigation complaint are identical or nearly identical, which further evidences the overlap in technology between the patents.

### III. SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE PLAINTIFF BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING.

Dr. Kavcic's motion is completely silent with respect to Broadcom's allegation that Dr. Kavcic has also breached the covenant of good faith and fair dealing, and thus it is unclear whether the motion is intended to address this aspect of Broadcom's counterclaim. Regardless, the evidence demonstrates that Dr. Kavcic rendering assistance to Broadcom's adversary regarding patents of the same technology unquestionably undermined the purpose of the Letter Agreement. Accordingly, summary judgment with respect to this counterclaim should similarly be denied.

The covenant of good faith and fair dealing is implied in every contract. *Koehrer v. Superior Court*, 181 Cal. App. 3d 1155, 1169, 226 Cal. Rptr. 820 (Cal. App. 4th Dist. 1986). It prevents contracting parties from "engaging in conduct which (while not technically transgressing the

express covenants) frustrates the other party's rights to the benefits of the contract." *Racine & Laramie, Ltd. v. Department of Parks & Recreation,* 11 Cal. App. 4th 1026, 1031–32 (1992). As a party to the Letter Agreement, Dr. Kavcic was obligated to refrain from undermining the purpose of the agreement and preventing Broadcom from benefiting from the contract. *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (Cal. App. 2d Dist. 2004) (The covenant imposes "not only . . . upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose."). Dr. Kavcic did not refrain.

The purpose of the Letter Agreement was for Dr. Kavcic to assist LSI in defense of the claims brought by UMN, not to provide Dr. Kavcic with access to confidential information for CMU's upcoming infringement case against the same products. But as early as February 17, 2016, months before he contacted LSI to assist in the UMN case, Dr. Kavcic was communicating with K & L Gates about a potential lawsuit against LSI. Dr. Kavcic himself sent two emails regarding "potential CMU/LSI litigation" in March 2016. Ex. DTX2 at P-11, P-14. Thus, there is at least a genuine issue of material fact as to whether Dr. Kavcic improperly provided his assistance to LSI in the UMN case in order to gain confidential information useful for the CMU Litigation, thus undermining the purpose of the Letter Agreement and breaching the covenant of good faith and fair dealing. *See A-Tek Mech., Inc. v. KHW Servs., Inc*., No. 3:21-CV-01974-H-WVG, 2022 WL 3044815, at * 5 (S.D. Cal. Aug. 2, 2022). Summary judgment disposing of this counterclaim case is thus inappropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Dr. Kavcic's Motion for Summary Judgment because Dr. Kavcic's conduct presents a material dispute of fact that he breached the Letter Agreement and the implied covenant of good faith and fair dealing.

Date: August 10, 2023

Respectfully submitted,

By: _/s/ Steven Rizzi_

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmith.com
Alan P. Block (SBN 143783)
ablock@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Steven Rizzi (admitted *pro hac vice*)
srizzi@McKoolSmith.com
Emily B. Tate (admitted *pro hac vice*)
etate@McKoolSmith.com
**MCKOOL SMITH, P.C.**
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001-8603
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Ramy E. Hanna (admitted *pro hac vice*)
rhanna@McKoolSmith.com
**MCKOOL SMITH, P.C.**
600 Travis Street, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

***Attorneys for Defendant Broadcom Corporation***

## PROOF OF SERVICE OF ELECTRONIC FILING

I hereby certify that on August 10, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the Electronic Service List for this case.

*/s/ Steven Rizzi*
Steven Rizzi