Georges A. Haddad, SBN 241785
Robert Ridge (*admitted pro hac vice*)
Clark Hill LLP
505 Montgomery Street, 13th Floor
San Francisco, CA  94111
(415) 984-8506
(415) 984-8599
ghaddad@clarkhill.com
rridge@clarkhill.com
Attorneys for Plaintiff
ALEKSANDAR KAVCIC, PH.D.

Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
Alan P. Block (SBN 143783)
ablock@mckoolsmithhennigan.com
**MCKOOL SMITH HENNIGAN, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:   (213) 694-1200
Facsimile:   (213) 694-1234

Steven Rizzi (*admitted pro hac vice*)
srizzi@McKoolSmith.com
Ramy E. Hanna (*admitted pro hac vice*)
rhanna@McKoolSmith.com
Emily B. Tate (*admitted pro hac vice*)
etate@mckoolsmith.com
**MCKOOL SMITH, P.C.**
One Manhattan West, 395 9th Avenue, 50th Floor
New York, New York 10001-8603
Telephone:   (212) 402-9400
Facsimile:   (212) 402-9444
Attorneys for Defendant
BROADCOM CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEKSANDAR KAVCIC, PH.D., | Case No. 20-cv-01246-JD |
| Plaintiff, | **JOINT PRETRIAL STATEMENT** |
| v. | |
| BROADCOM CORPORATION, | |
| Defendant. | |

1    Plaintiff Aleksandar Kavcic, Ph.D. ("Dr. Kavcic") and Defendant Broadcom Inc.

2    ("Broadcom") (collectively "the Parties") submit the following Joint Pretrial Statement.

3    **i.    <u>SUBSTANCE OF THE ACTION</u>**

4    **Dr. Kavcic's Statement:**

5    Dr. Kavcic filed this lawsuit seeking a declaration of his rights and obligations under a 2016

6    consulting agreement with Broadcom (the "Letter Agreement"). Pursuant to the Letter Agreement

7    Dr. Kavcic provided a prior art opinion to University of Minnesota ("UMN") relating to the

8    encoding of data written to magnetic disks in hard disk drives. Dr. Kavcic is asking the Court to

9    declare:

10       (1)    Whether he received confidential information from Broadcom;

11       (2)    Whether the patent at issue in the UMN litigation is sufficiently similar to the patents

12              at issue in the Carnegie Mellon University ("CMU") v. Broadcom litigation;

13       (3)    Whether the CMU falls into one of the two categories of prohibited entities identified

14              in the Letter Agreement (a "party seeking to manufacture, distribute, or sell products

15              related to the subject matter of covered by any claim of any patent" or a "party seeking

16              to license intellectual property rights associated with this technology.");

17       (4)    If the Letter Agreement prohibits Dr. Kavcic from consulting with CMU, whether the

18              Letter Agreement is void pursuant to Cal. Bus. & Prof. Code Ann. § 16600;

19    In response to this litigation, Broadcom filed a cross-complaint alleging Dr. Kavcic breached

20    his consulting agreement with Broadcom and/or has breached his covenant of good faith and fair

21    dealing by consulting for a company in litigation against Broadcom.  Dr. Kavcic denies these claims.

22    **Broadcom's Statement:**

23    In response to Dr. Kavcic's declaratory judgment complaint, Broadcom counterclaimed for,

24    *inter alia*, breach of the Letter Agreement due to his role as a litigation consultant for CMU and its

25    counsel in *Carnegie Mellon University v. LSI Corp. et al*., Case No. 3:18-cv-04571-JD (N.D. Cal.)

26    (the "CMU Litigation"), K & L Gates, which is also counsel to UMN in *Regents of the University*

27    *of Minnesota v. LSI Corp., et al.*, Case No. 16-cv-02891 (D. Minn.) (the "UMN Litigation"), now

28

JOINT PRETRIAL STATEMENT

1   an active case.

2       The CMU and UMN Litigations involve the same accused products, hard disk drive

3   ("HDD") controllers, and more specifically, the "read channel" functionality of such controllers.

4   Dr. Kavcic worked directly with LSI's litigation counsel defending the UMN litigation after

5   executing the Letter Agreement acknowledging his confidentiality obligations to LSI and further

6   agreeing not to assist another party seeking to license patents to LSI involving technology associated

7   with the technology at issue in the UMN Litigation.

8       **ii.**     **RELIEF REQUESTED**

9   **Dr. Kavcic's Statement:**

10       This lawsuit is a civil action arising under the Declaratory Judgments Act, 28 U.S.C. § 2201.

11   Dr. Kavcic seeks to declare his rights and obligations under a 2016 Letter Agreement with

12   Broadcom.

13       At issue is:

14       (1)     Whether the 2016 letter agreement bars Dr. Kavcic from assisting CMU on a going

15               forward basis in CMU's lawsuit against Broadcom;

16       In response to the cross-complaint, Dr. Kavcic states at issue is:

17       (2)     Whether Dr. Kavcic obtained some unknown confidential information as part of his

18               consulting work with LSI during the UMN litigation;

19       (3)     Whether Dr. Kavcic communicated that unknown confidential information with CMU

20               lawyers.

21       If the Court concludes that confidential information was actually shared with Dr. Kavcic,

22   whether the Court can craft a declaratory order preserving Dr. Kavcic's ability to participate in the

23   defense of his own patent while sufficiently ensuring that any confidential information obtained

24   from Broadcom is not communicated to counsel representing Dr. Kavcic and CMU.

25   **Broadcom's Statement:**

26       Defendant seeks a judgment that Dr. Kavcic has breached the Letter Agreement by, inter

27   alia, consulting with CMU in the CMU Litigation, and an order barring Dr. Kavcic from consulting

28

1    or conferring with CMU or its counsel (which is also counsel to UMN) in both the CMU and UMN

2    Litigations.

3        **iii.**    <u>**STATEMENT OF FACTS**</u>

4    **Dr. Kavcic's Statement of Facts:**

5           The parties disagree as to whether the Letter Agreement bars Dr. Kavcic from participating

6    in the defense of his own patents at issue in the CMU litigation.  The core of the dispute is:

7           (1)    Whether Broadcom provided Dr. Kavcic with any confidential information or

8    litigation strategy while he was a consultant pursuant to the Letter Agreement in 2016;

9           (2)    Whether Dr. Kavcic communicated any confidential information or litigation strategy

10   with K & L Gates, attorneys for both CMU and UMN after he finished consulting with Broadcom

11   pursuant to the Letter Agreement in 2016;

12          (3)    Whether the CMU falls into one of the two categories of prohibited entities identified

13   in the Letter Agreement (a "party seeking to manufacture, distribute, or sell products related to the

14   subject matter of covered by any claim of any patent" or a "party seeking to license intellectual

15   property rights associated with this technology.");

16          (4)    Whether the technology at issue in the UMN Litigation is the same technology as the

17   CMU Patents.

18          The facts of the dispute are as follows:

19          (1)    Dr. Kavcic is the co-inventor of U.S. Patent Nos. 6,201,839 and 6,438,180 ("CMU

20   Patents").   The CMU Patents claim inventive detector technology that allowed for more accurate

21   reading of data on hard disk drives ("HDDs"), which in turn enabled HDDs to store data

22   substantially more densely.  CMU, where Dr. Kavcic was a Ph.D student at the time of invention,

23   is the owner of the CMU Patents

24       **UMN Litigation**

25          (2)    In August 2016, the University of Minnesota sued two subsidiaries of Broadcom

26   Corp. LSI Corp. ("LSI") and Avago Technologies U.S. Inc. ("Avago") (Broadcom, LSI and Avago

27   together the "Broadcom Entities"), for infringement of a patent owned by UMN on an invention for

28

JOINT PRETRIAL STATEMENT

encoding data to be written to HDDs ("UMN Litigation"). Shortly thereafter, Broadcom sought to engage Dr. Kavcic as a consultant for the Broadcom Entities' defense of the UMN Litigation. On November 21, 2016, Broadcom and Dr. Kavcic signed the Letter Agreement governing the terms of Dr. Kavcic's consultation with Broadcom on the UMN Litigation.

(3)     Dr. Kavcic spent 23.9 hours and completed his consulting services under the Letter Agreement by the end of 2016 and has not performed other work for Broadcom since.

**CMU Litigation**

(4)     Both CMU Patents expired on April 3, 2018, twenty years after the earliest non-provisional filing date, i.e., April 3, 1998. On July 27, 2018, months after the CMU Patents' expiration and the stay of the UMN Litigation, and well over a year after Dr. Kavcic completed his consulting with Broadcom, CMU sued LSI and Avago for past infringement of the CMU Patents ("CMU Litigation"). Since CMU filed suit, Dr. Kavcic, as co-inventor of the CMU Patents, worked with CMU to defend the validity of the CMU Patents against Defendants' invalidity challenges in the CMU Litigation.

(5)     For over a year after CMU filed suit, none of the Broadcom Entities made any mention to CMU or Dr. Kavcic of the Letter Agreement or Dr. Kavcic's purported obligations under the Letter Agreement. In October 2019 the Broadcom Entities notified CMU of the Letter Agreement, demanding Dr. Kavcic leave a claim construction deposition of an LSI and Avago expert.

**Broadcom's Statement of Facts:**

**The Principal Fact Issues in Dispute**

(1)     Whether Dr. Kavcic was exposed to Broadcom privileged and/or confidential information from LSI's counsel regarding LSI's defense of UMN's infringement allegations concerning the read channel functionality in LSI HDD chips while he was a litigation consultant pursuant to the Letter Agreement.

(2)     Whether Dr. Kavcic communicated any Broadcom privileged and/or confidential information to K & L Gates, attorneys for both CMU and UMN in their respective patent

JOINT PRETRIAL STATEMENT

infringement litigations concerning the read channel functionality in LSI HDD chips, after consulting with Broadcom pursuant to the Letter Agreement in 2016.

(3)   Whether Dr. Kavcic made use of any Broadcom privileged and/or confidential information, whether intentionally or inadvertently, in connection with his assistance to K & L Gates in the CMU Litigation.

(4)   Whether CMU was or is a "party seeking to license intellectual property rights associated with [the] technology" that was the subject of the Letter Agreement.

(5)   Whether the technology at issue in the CMU Litigation is associated with the technology at issue in the UMN Litigation.

**Plaintiff Dr. Aleksandar Kavcic**

(1)   Dr. Kavcic is a named co-inventor of U.S. Patent Nos. 6,201,839 and 6,438,180 ("CMU Patents").   The CMU Patents are directed to high density magnetic recording sequence detectors.  CMU, where Dr. Kavcic was a Ph.D student at the time of the work described in the patents, is the owner of the CMU Patents.  (JTX21, CMU_Broadcom_000003).

(2)   In August 2016, Dr. Kavcic was a resident of the state of Hawaii, where he was employed as a professor with the University of Hawaii.  (JTX84, Aug. 10, 2022 Tr. at 15-16).

(3)   Dr. Kavcic has been a resident of the state of Texas since prior to at least November 5, 2016.   (JTX84 at 22).

(4)   Dr. Kavcic has never been a resident of the state of California, has no real property in California, no bank accounts in California, has never been employed by any employer within California, and has no other business or financial ties with California.  (JTX85, Mar. 15, 2023 Tr. at 7-8).

(5)   By August 2016, Dr. Kavcic was aware that he would be receiving a substantial payment from a settlement reached between Carnegie Mellon University and Marvell.  (JTX84 at 17).  The lawsuit, *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290 (W.D. Pa. Mar. 31, 2014), alleged infringement of the same CMU Patents (the "Marvell Litigation").

JOINT PRETRIAL STATEMENT

(6)  ██████████████████████████████████████

██████████████████████████████████

**Dr. Kavcic's Interactions with LSI Prior to the UMN Litigation**

(7)  Between 2007 and 2016, Dr. Kavcic gave a number of talks and presentations to LSI. (JTX84 at 80).

(8)  Dr. Kavcic also maintained regular contact during this time with a former student, Dr. Shaohua Yang, who was employed at LSI.  (JTX85 at 21; JTX84 at 19).

(9)  Throughout his regular contact with LSI, Dr. Kavcic did not notify LSI of his belief that LSI was making use of the CMU Patents, or that CMU intended to sue LSI for infringement of the CMU Patents.

**The UMN Litigation**

(10)  On August 25, 2016, the University of Minnesota filed suit for patent infringement against LSI and Avago Technologies U.S. Inc. ("Avago") (collectively, the "Broadcom Entities") in the District of Minnesota (the "UMN Litigation").  The patent-in-suit is U.S. Patent No. 5,859,601 (the "'601 patent") (JTX7).

(11)  UMN is represented in the UMN Litigation by the law firm K & L Gates LLP ("K & L Gates"), including Anna Shabalov, Christopher Verdini, Mark G. Knedeisen, Patrick J. McElhinny, and Theodore J. Angelis.

(12)  The Accused Products in the UMN Litigation are LSI HDD chips, including HDD controller systems-on-a-chip and/or stand-alone read channel chips.  (JTX86).

(13)  When Dr. Kavcic learned of the UMN Litigation, he contacted Dr. Shaohua Yang at LSI to discuss the UMN Litigation.  (JTX85 at 21-22; JTX84 at 19-20).  Dr. Kavcic was aware at the time that K & L Gates represents UMN in the UMN Litigation.   (JTX85 at 111).

(14)  Shortly thereafter, Dr. Kavcic began work as a consultant, assisting LSI in its defense of the UMN Litigation.  (JTX84 at 20).

(15)  On November 21, 2016, Broadcom and Dr. Kavcic signed the Letter Agreement governing the terms of Dr. Kavcic's consultation with Broadcom on the UMN Litigation.  The Letter

JOINT PRETRIAL STATEMENT

Agreement was in effect from November 21, 2016 through December 4, 2019, when Dr. Kavcic terminated it.   (JTX1; DTX3, Dec. 4, 2019 Letter from A. Kavcic to M. Blake (Broadcom) terminating Litigation Consulting Agreement).

The Letter Agreement is addressed to Dr. Kavcic and states, in relevant part:

> "Your work on behalf of Broadcom is confidential and may be protected under the attorney-client privilege, the litigation work product doctrine, or other applicable protections/privileges. You agree that the protections/privileges associated with such information belong to Broadcom and that you will not disclose or use such information provided or created pursuant to this Letter Agreement or any work done under this Letter Agreement … You must treat your work as confidential and may not disclose it orally or in writing to any third parties without the express, prior written consent of Broadcom …
>
> …
>
> This Letter Agreement confirms that to the best of your knowledge, you have no you have no conflicts with Broadcom or the Regents of the University of Minnesota that would prevent you from assisting Broadcom in this matter. You also agree not to assist, in regards to the subject matter of this engagement for Broadcom, any other party seeking to manufacture. distribute, or sell products related to the subject matter or covered by any claim of any patent as to which you are providing consulting advice, or any other party seeking to license intellectual property rights associated with this technology, without Broadcom's written consent."

(16)   LSI is represented in the UMN Litigation by the law firm Kilpatrick, Townsend & Stockton LLP ("KTS").  In his role as a litigation consultant to LSI, Dr. Kavcic primarily interfaced with KTS attorney and counsel of record Edward J. Mayle.  (JTX84 at 30-31).

(17)   Edward Mayle is located in Denver, Colorado, and based in KTS's Denver office.

(18)   During Dr. Kavcic's time as a consultant for LSI, Dr. Kavcic and Mr. Mayle exchanged emails and often spoke over the phone.  (JTX85 at 39).

(19)   ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

JOINT PRETRIAL STATEMENT

1 ████████████████████████████████████████████████████████████

2 ██████████

3       (20)   Dr. Kavcic was paid an hourly rate of $500 for his consulting work in the UMN

4 Litigation, and billed Broadcom for about 24 hours of time spent in November and December 2016.

5 (JTX1; JTX88, Dr. Kavcic's December 3, 2016 Invoice for Consulting Services).

6       (21)   Dr. Kavcic was a resident of Texas during the entire period of his engagement and

7 performance of services under the Letter Agreement.  (JTX85 at 7).

8       (22)   In email exchanges on November 19-20, 2016, Mr. Mayle and Dr. Kavcic discussed

9 ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████

16       (23)   In an email to Dr. Kavcic on November 21, 2016, Mr. Mayle discussed Broadcom's

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████

28

20-cv-01246-JD

JOINT PRETRIAL STATEMENT

1
2

████████████████████████████████████████████

███████████████████████

3       (24)   Since the Marvell Litigation, other than his work with Broadcom under the Letter

4   Agreement, Dr. Kavcic has not performed any litigation consulting for any entity other than CMU

5   and has no plans to do so in the future.  (JTX85 at 16).

6       **The CMU Litigation**

7       (25)   On July 27, 2018, CMU filed suit against LSI and Broadcom in the Northern District

8   of California for alleged past infringement of the CMU Patents (the "CMU Litigation").  (JTX87,

9   Complaint, Carnegie Mellon University v. LSI Corp. et al., Case No. 3:18-cv-04571-JD (Jul. 27,

10   2018, N.D. Cal.) (ECF No. 1)).

11       (26)   CMU is represented in the CMU Litigation by the law firm K & L Gates LLP ("K &

12   L Gates"), including Anna Shabalov, Christopher Verdini, Mark G. Knedeisen, Patrick J.

13   McElhinny, and Theodore J. Angelis.   (JTX87).

14       (27)   Dr. Kavcic had communications with K & L Gates regarding LSI's potential

15   infringement of the CMU patents at least as early as February 17, 2016.  (DTX2, CMU Privilege

16   Log).

17       (28)   In a privilege log produced by CMU in this litigation, CMU noted in its privilege

18   summary ten emails regarding "CMU/LSI litigation" that predate Dr. Kavcic's engagement with

19   LSI in the UMN Litigation, including emails where Dr. Kavcic is the author.  (DTX2).

20       (29)   For example, Dr. Kavcic received four emails on February 17 and February 19, 2016

21   that are summarized as "Email thread prepared in anticipation of litigation and for purposes of

22   seeking and providing legal advice re: CMU/Marvell litigation and potential CMU/LSI litigation."

23   (DTX2).

24       (30)   Dr. Kavcic received four emails on February 23, March 10, March 11, and March 12,

25   2016 that are summarized as "Email thread prepared in anticipation of litigation and for purposes

26   of seeking and providing legal advice re: potential CMU/LSI litigation."  (DTX2).

27

28

JOINT PRETRIAL STATEMENT

(31)   Dr. Kavcic sent two emails on March 9 and March 11, 2016 that are summarized as "Email thread prepared in anticipation of litigation and for purposes of seeking legal advice re: potential CMU/LSI litigation" and "Email thread prepared in anticipation of litigation and for purposes of seeking and providing legal advice re: potential CMU/LSI litigation," respectively. (DTX2).

(32)   Dr. Kavcic continued to consult with CMU with respect to the CMU/LSI litigation in 2017, after he had acted as a litigation consultant for LSI.  (DTX2).

(33)   Dr. Kavcic destroyed documents concerning his communications with LSI's counsel pursuant to the Letter Agreement to prevent them from being discovered in the CMU Litigation. JTX84 at 34-35.

(34)   The CMU Patents expired on April 3, 2018, after Dr. Kavcic began consulting with CMU regarding the CMU Litigation.

(35)   Broadcom became aware of Dr. Kavcic's involvement in the CMU Litigation in October 2019, when Dr. Kavcic attended the deposition of LSI's claim construction expert to assist K & L Gates in the questioning.  (JTX8).

(36)   On October 21, 2019, Broadcom notified Dr. Kavcic that he was in material breach of the Letter Agreement and demanded Dr. Kavcic cease and desist any further assistance to CMU or its attorneys, including K & L Gates.  (JTX8).

**Other Experts Retained By or Available To CMU**

(37)   The other named co-inventor of the CMU patents is Dr. Jose Moura, a current professor at CMU.  (JTX5; JTX6).

(38)   In both the Marvell and CMU Litigations, CMU has retained several other technical experts to assist CMU and its counsel in those cases.

(39)   In the Marvell litigation, CMU retained H. Vincent Poor, Christopher Bajorek, Steven McLoughlin, Gilbert Strang, and Thomas A. Day to assist with litigating the CMU Patents.  (DTX5, H. Vincent Poor Confidentiality Agreement, CMU_Broadcom_000001; DTX6, Christopher Bajorek Confidentiality Agreement, CMU_Broadcom_000010; DTX9, Steven McLaughlin

1    Confidentiality Agreement, CMU_Broadcom_000015; DTX10, Expert Declaration of Gilbert

2    Strang, Ph.D, CMU_Broadcom_000017; JTX24, CMU Non-Employee Expense Report for A.

3    Kavcic, CMU_Broadcom_000069).

4        (40)   CMU retained both Christopher Bajorek and Steven McLaughlin to assist in the CMU

5    Litigation.   (DTX7, Christopher Bajorek Acknowledgment and Agreement to Be Bound,

6    CMU_Broadcom_000013; DTX8, Steven McLaughlin Acknowledgment and Agreement to Be

7    Bound, CMU_Broadcom_000014).

8        (41)   Dr. Moura and Dr. McLaughlin are both "equipped to defend" the CMU Patents.

9    (JTX85 at 80).

10       **Subject Matter of the '601, '839, and '180 Patents**

11       (42)   The UMN '601 patent is directed to an "[a]pparatus and method for coding to improve

12   the minimum distance properties of sequence detectors operating at high densities in storage

13   systems." (JTX7, '601 patent, Abstract).

14       (43)   The UMN '601 patent describes a "maximum transition run (MTR) code" and states

15   that when it is used with "partial response maximum likelihood (PRML) detectors, the bit error rate

16   performance improves significantly over existing combinations of codes and detectors."  (JTX7,

17   '601 patent, Abstract).

18       (44)   The "Field of the Invention" portion of the '601 patent states that "the invention

19   pertains to an improved coding technique involving data recovery channels utilizing sequence

20   detection methods." (JTX7, '601 patent, 1:9-12).

21       (45)   The UMN '601 patent states that "[e]rrors in sequence detectors arise mostly from

22   difficulty in distinguishing minimum distance patterns. . . The performance of sequence detectors

23   such as $E^2$PRML can be improved by coding to remove the patterns that cause minimum distance

24   error events, thereby increasing the minimum distance. This increase in the minimum distance as a

25   result of coding is termed coding gain."   (JTX7, '601 patent, 2:18-34 ("Background of the

26   Invention")).

27

28

JOINT PRETRIAL STATEMENT

(46)   The "Summary of the Invention" portion of the '601 patent states that "[w]hen the MTR coding scheme is combined with a certain class of sequence detectors to recover written data in high density recording, the bit-error-rate (BER) performance is improved significantly over existing code/detector combinations."  (JTX7, '601 patent, 3:3-7 ("Summary of the Invention")).

(47)   The "Description of the Preferred Embodiment" portion of the '601 patent states that "[t]o realize the coding gain at the detector output, the detector has to be modified.  In the case of PRML systems, this amounts to removing those states that correspond to the illegal data patterns from a trellis."  (JTX7, '601 patent, 6:57-58).

(48)   Claim 13 of the '601 patent states:  "A method for encoding m-bit binary datawords into n-bit binary codewords in a recorded waveform, where m and n are preselected positive integers such that n is greater than m, comprising the steps of: receiving binary datawords; and producing sequences of n-bit codewords; imposing a pair of constraints (j;k) on the encoded waveform; generating no more than j consecutive transitions of said sequence in the recorded waveform such that $j \geqq 2$; and generating no more than k consecutive sample periods of said sequences without a transition in the recorded waveform."

(49)   Claim 14 of the '601 patent states: "The method as in claim 13 wherein the consecutive transition limit is defined by the equation $2 \leqq j < 10$."

(50)   Claim 21 of the '601 patent states:  "The method as in claim 13 wherein the method of receiving data incorporates the removal of certain code-violating patterns from the detection process wherein the detection process comprises at least one of the steps of: removing states and state transitions corresponding to more than j consecutive transitions from a Viterbi trellis; removing branches from a fixed delay tree search corresponding to more than j consecutive transitions; removing branches from a fixed delay tree search corresponding to more than j consecutive transitions when the previous decision is considered part of the sequence; forming boundaries for a signal space formulation such that points in the signal space constellation corresponding to sequences containing more than j consecutive transitions are not considered; and selecting boundaries in a signal space formulation based on a constellation that does not include points

JOINT PRETRIAL STATEMENT

corresponding to sequences containing more than j consecutive transitions when the previous decision is considered part of the sequence."

(51)   In the UMN Litigation, UMN is asserting claim 14 of the '601 patent.  (JTX86).

(52)   The "Field of the Invention" portion of the CMU '839 patent states that "[t]he present invention is directed generally to high density magnetic recording sequence detectors, and, more particularly, to correlation-sensitive sequence detectors."  (JTX5, '839 patent, 1:20-22).

(53)   The "Field of the Invention" portion of the CMU '180 patent states that "[t]she present invention is directed generally to sequence detectors, and, more particularly, to sequence detectors in ISI memory channels."  (JTX6, '180 patent, 1:20-22).

(54)   The CMU patents are directed to "a method of determining branch metric values for branches of a trellis for a Viterbi-like detector."  (JTX5, '839 patent, Abstract).

(55)   The "Summary of the Invention" portion of the CMU patents states that "[t]he present invention represents a substantial advance over prior sequence detectors. Because the present invention takes into account the correlation between noise samples in the readback signal, the detected data sequence is detected with a higher degree of accuracy."  (JTX5, '839 patent, 2:24-28; JTX6, '180 patent, 2:35-39).

(56)   Claim 4 of the '839 patent recites: "A method of determining branch metric values for branches of a trellis for a Viterbi-like detector, comprising: selecting a branch metric function for each of the branches at a certain time index from a set of signal-dependent branch metric functions; and applying each of said selected functions to a plurality of signal samples to determine the metric value corresponding to the branch for which the applied branch metric function was selected, wherein each sample corresponds to a different sampling time instant."

(57)   Claim 1 of the '180 patent recites: "A method of determining branch metric values in a detector, comprising: receiving a plurality of time variant signal samples, the signal samples having one of signal-dependent noise, correlated noise, and both signal dependent and correlated noise associated therewith; selecting a branch metric function at a certain time index; and applying the selected function to the signal samples to determine the metric values."

JOINT PRETRIAL STATEMENT

1   (58)   Claim 2 of the '180 patent recites: "The method of claim 1, wherein the branch metric

2   function is selected from a set of signal-dependent branch metric functions."

3   (59)   Claim 5 of the '180 patent recites: "The method of claim 1, wherein the detector is

4   selected from a group consisting of a Viterbi detector, a soft output Viterbi detector, a Generalized

5   Viterbi detector, and a BCJR detector."

6   (60)   In the CMU Litigation, CMU is asserting infringement of claim 4 of the '839 patent

7   and claim 2 of the '180 patent.  (JTX87).

8   (61)   The respective complaints in the CMU and UMN Litigations both allege that the

9   asserted patents improve the performance of the read channel in a magnetic HDD, and allow for

10   increased data density.  (JTX86; JTX87).

11   (62)   According to the CMU Complaint, the CMU Patents "generally claim a method used

12   in a 'read channel' for improving the accuracy of detecting data written to a storage medium, such

13   as a magnetic disk in a hard disk drive ("HDD") thereby substantially improving the performance

14   of the read channel and allowing for increased data density."  (JTX87, CMU Complaint ¶ 2).

15   (63)   According to the UMN Complaint, the UMN patent "generally claims a method for

16   encoding data to be written to a magnetic disk in a hard disk drive ("HDD") that increases the

17   accuracy with which the data are subsequently read off of those magnetic disks, thereby

18   substantially improving the performance of the HDD and allowing for increased data density."

19   (JTX86, UMN Complaint ¶ 2).

20   (64)   In the UMN Litigation, the products accused of infringement are "MTR-enabled

21   Products," which the UMN Complaint defines as "HDD Chips sold under the tradename TrueStore

22   and simulators reading MTR-encoded waveforms."  (JTX86, UMN Complaint ¶ 69).

23   (65)   In the CMU Litigation, the "Exemplary Accused Products" include "HDD Chips sold

24   under the tradename TrueStore ("Accused Chips") and computer-implemented detectors that

25   execute simulation code files to apply a set of branch metric functions to actual readback signals

26   ("Simulators")."  (JTX87, CMU Complaint ¶ 79).

27

28

JOINT PRETRIAL STATEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(66)   Both the UMN and CMU Complaints include the following identical or nearly identical paragraphs under "Factual Background":

20-cv-01246-JD

JOINT PRETRIAL STATEMENT

| UMN Litigation | CMU Litigation |
|---|---|
| 32. An HDD is a ubiquitous device that stores digital information on one or more rotating disks, also sometimes referred to as "platters," that are coated with magnetic material. | 28. By way of example, an HDD is a ubiquitous device that stores digital information on one or more rotating disks, also sometimes referred to as "platters," that are coated with magnetic material. |
| 33. Data are stored in sequential, individual magnetically coated regions on the disk by means of controlling the direction of magnetization of each individual region. | 29. Data are stored in sequential, individual magnetically coated regions on the disk by means of controlling the direction of magnetization of each individual region. |
| 34. An HDD comprises a read/write device that includes both a write head that writes the data to the disk and a read head that reads the data once they are written. | 30. An HDD comprises a read/write device that includes both a write head that writes the data to the disk for storage and a read head that subsequently reads the written data when needed. |
| 35. When user data are to be written to the disk, the data are encoded and then the encoded data are converted into an analog signal that is sent to the write head. The write head records the resulting signal on the magnetic disk by magnetically polarizing the regions on the disk in accordance with the received signal. | 31. When user data are to be written to the disk, the data are encoded and then the encoded data are converted into an analog signal that is sent to the write head. The write head records the resulting signal on the magnetic disk by magnetically polarizing bit regions on the disk in accordance with the received signal. |
| 36. Each polarized region on the magnetic recording layer of the disk has a magnetic polarization that, once written by the write head, is oriented in a particular direction. The magnetic polarity of these regions can be changed from one direction to its opposite by the write head in order to write the data to the disk." | 32. Each polarized bit region on the magnetic recording layer of the disk has a magnetic polarization that, once written by the write head, is oriented in a particular direction. The magnetic polarity of these regions can be changed from one direction to its opposite by the write head in order to write the data to the disk. |
| 37. An HDD also includes a read channel that performs the "immensely tricky task of converting the analog data signal" generated from the disk of the HDD "into binary bits." *See* www.avagotech.com/products/hard-disk-drives/socs-read-channel. | 33. An HDD also includes a read channel that converts the analog data signal generated from the disk of the HDD into binary bits. |
| 38. When adjacent polarized regions are magnetized in opposing directions, there is a "transition" in the polarity of the regions that is detected by the read channel of the HDD when reading the data. | 34. As shown in the exemplary diagram below, when adjacent polarized bit regions are magnetized in opposing directions (left and right in the diagram below), there is a "transition" in the polarity of the bit regions. The sequence of transitions and nontransitions is detected by the read channel of the HDD when reading the data. |
| 39. When reading the data from the disk, the read head hovers over the disk as the disk rotates below it. The read head senses the magnetic fields from the magnetic medium and | 35. There are two different types of transitions - positive and negative. As shown in the |

JOINT PRETRIAL STATEMENT

| | |
|---|---|
| converts the sensed magnetic fields into an analog "readback" signal.<br><br>(JTX86, UMN Complaint ¶¶ 32-39). | diagrams below, a positive transition is where the "north" ends of the polarized bit regions abut, and a negative transition is where the "south" ends abut.<br><br>36. When reading the data from the disk, the read head hovers over the disk as the disk rotates below it. The read head senses the magnetic fields from the magnetic medium and converts the sensed magnetic fields into an analog "readback" signal.<br><br>(Complaint, CMU Litigation ¶¶ 28-36) |
| 41. One performance metric for a read channel is the bit error rate ("BER"), which is the rate at which the read channel makes errors in determining the data written to the disk.<br><br>(JTX86, UMN Complaint ¶¶ 41) | 129. One performance metric for a read channel is the bit error rate ("BER"), which is the rate at which the read channel makes errors in determining the data written to the disk.<br><br>(JTX87, CMU Complaint ¶ 129) |
| 42. "Data continues to grow, driven by video, social media, enterprise applications and the cloud. To meet this demand, hard drive manufacturers continually drive more capacity per platter in hard drives." *See* www.avagotech.com/products/harddisk-drives/socs-read-channel.<br><br>(JTX86, UMN Complaint ¶ 42) | 40. "Data continues to grow, driven by video, social media, enterprise applications and the cloud. To meet this demand, hard drive manufacturers continually drive more capacity per platter in hard drives." *See* https://www.broadcom.com/products/storage/hard-disk-drives/socs-readchannel.<br><br>(JTX87, CMU Complaint ¶ 40) |
| 40. A sequence detector in the read channel converts the analog readback signal into binary data by determining from the signal the likely sequence of transitions and non-transitions recorded to the magnetic medium, where detected transitions can indicate a binary "1" and a nontransition can indicate a binary "0".<br><br>(JTX86, UMN Complaint ¶ 40) | 37. A sequence (or data) detector in the read channel converts the analog readback signal into binary data by determining from the signal the likely sequence of transitions and non-transitions recorded to the magnetic medium. For example, in some read channels, detected transitions indicate a binary "1" and a nontransition indicates a binary "0".<br><br>(JTX87, CMU Complaint ¶ 37) |
| 44. A major and increasing source of noise in HDDs over the past 15 years is media noise, which includes noise resulting from transitions on the magnetic media.<br><br>(JTX86, UMN Complaint ¶ 44) | 45. Since the early 2000s, noise in the readback signal has continued to increase, particularly "media noise," which is now the dominant factor that limits the detector's ability to accurately read data on the disk.<br><br>(JTX87, CMU Complaint ¶ 45) |
| 45. Increasing the data capacity of an HDD increases the density of the transitions on the magnetic disk, which in turn increases the | 41. Increasing the data capacity of an HDD increases the density of the transitions on the magnetic disk, which in turn increases the |

20-cv-01246-JD

JOINT PRETRIAL STATEMENT

| amount of noise in the analog data signal generated by the read head as it passes over the bit regions.<br><br>(JTX86, UMN Complaint ¶ 45) | amount of noise, in the analog data signal generated by the read head as it passes over the bit regions.<br><br>(JTX87, CMU Complaint ¶ 41) |
| --- | --- |
| 75. Defendants make, use, and sell devices with so-named "MTR" code capability, including all read channel/SOC HDD Chips currently sold under the tradename TrueStore and simulators for reading MTR-encoded recorded waveforms ("the MTR-enabled Products"). MTR-enabled Products in the TrueStore product line include but are not limited to the RC5101 Spyder ELP PS Azure, the RC5110 Spyder ELP PS Boxster, and the RC5200 Spyder ELP PS Corvette read channels and SOCs that include those read channels.<br><br>(JTX86, UMN Complaint ¶ 75) | 79. Defendants make, use, and sell HDD read channel devices that implement the invention claimed in the Patents, including HDD Chips sold under the tradename TrueStore ("Accused Chips") and computer-implemented detectors that execute simulation code files to apply a set of branch metric functions to actual readback signal samples ("Simulators") (the Accused Chips and Simulators are collectively the "Exemplary Accused Products"). Exemplary Accused Products in the TrueStore product line include but are not limited to the RC5101 Spyder ELP PS Azure, the RC5110 Sypder ELP PS Boxster, and the RC5200 Spyder ELP PS Corvette read channels and SOCs that include those read channels.<br><br>(JTX87, CMU Complaint ¶ 79) |
| 83. In 2012, Dr. Lee gave a presentation at the Chinese American Information Storage Society ("CAISS") Annual Conference titled "Read Chanel [sic] Technologies for Data Storage."<br><br>84. A true and correct copy of the slides for Dr. Lee's presentation to CAISS at its 2012 annual conference is attached as Exhibit 9.<br><br>85. In Slide 6 of his presentation, shown below, Dr. Lee declared "RLL: transition aware" was a "major" technology for HDDs in the "Beyond 2010" period.<br><br>(JTX86, UMN Complaint ¶¶ 83-85) | 87. In addition to Dr. Lee's verbal and written admissions to Prof. Kavcic, Dr. Lee gave a presentation in 2012 at the Chinese American Information Storage Society ("CAISS") Annual Conference titled "Read Chanel [sic] Technologies for Data Storage."<br><br>88. A true and correct copy of the slides for Dr. Lee's presentation to CAISS at its 2012 annual conference is attached as Exhibit 8.<br><br>89. In Slide 6 of his presentation, shown below, Dr. Lee identified "pattern-dependent filter" as a "major" technology for "noise processing" in the 2000-2010 period.<br><br>(JTX87, CMU Complaint ¶¶ 87-89) |

JOINT PRETRIAL STATEMENT

iv.     **Disputed Legal Issues**

**Dr. Kavcic's Statement:**

(1)     Whether any information or communication provided to Dr. Kavcic by Broadcom or its attorneys was confidential.

(2)     Whether the 2016 letter agreement bars Dr. Kavcic from assisting CMU on a going forward basis in CMU's lawsuit against Broadcom.

(3)     If the Letter Agreement prohibits Dr. Kavcic from consulting with CMU, whether the Letter Agreement is void pursuant to Cal. Bus. & Prof. Code Ann. § 16600 which expressly states, "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

(4)     Whether Broadcom has suffered any damages.

**Broadcom's Statement:**

(1)     Whether the Letter Agreement is governed by California law or Texas law.

(2)     Whether the restrictive covenant in the Letter Agreement is enforceable under either California law or Texas law, i) while it was in force; and ii) after it was terminated.

(3)     Whether the Court should reform the restrictive covenant in the Letter Agreement if it is found to be unenforceable under Texas law.

(4)     Whether Dr. Kavcic breached the Letter Agreement.

(5)     Whether Dr. Kavcic violated his covenant of good faith and fair dealing in connection with the Letter Agreement.

(6)     Whether Dr. Kavcic should be enjoined or disqualified from serving as an expert to CMU in the CMU Litigation.

**Broadcom's Conclusions of Law:[1]**

**Dr. Kavcic Breached the Letter Agreement Under Texas Law**

(7)     "The elements of a breach of contract claim are:  '(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff

---

[1] Plaintiff Dr. Kavcic believes conclusions of law are not part of the Standing Order for Civil Jury Trials which was

JOINT PRETRIAL STATEMENT

was damaged as a result of the breach.' " *Brooks v. Excellence Mortg., Ltd.*, 486 S.W.3d 29 (Tex. App. 2015) (quoting *McLaughlin, Inc. v. Northstar Drilling Techs., Inc.*, 138 S.W.3d 24, 27 (Tex.App.–San Antonio 2004, no pet.)

    (8)   Confidential business information can properly be protected through a covenant not to compete. *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App. 2016) ("Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete."); *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011).

    (9)   "Confidential information essentially is information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege [citations].' It could include discussion of the party's 'strategy in the litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and weaknesses of each side, the role of each of [the party's] experts to be hired, and anticipated defenses." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp.2d 1087, 1094 (N.D. Cal. 2004) (quoting *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 279 (S.D. Ohio 1988) and *Mayer v. Dell*, 139 F.R.D. 1, 4 (D.D.C.1991).)

    (10)   The Letter Agreement's restrictive covenant is therefore enforceable. *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 652 (Tex. App. 2009) ("Moreover, a covenant not to compete is enforceable not only to protect trade secrets but also to protect proprietary and confidential information."); *Ireland v. Franklin*, 950 S.W.2d 155, 158 (Tex. App. 1997) (enforcing covenant not to compete).

    (11)   Even if the restrictive covenant is found to be overbroad, the court is required to modify and enforce the provision. Tex. Bus. & Com. Code Ann. § 15.51(c) ("the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time,

---

used to craft this pre-trial statement for this bench trial. Dr. Kavcic reserves his right to issue his own conclusions of law at the close of evidence in this one witness bench trial.

JOINT PRETRIAL STATEMENT

geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the promisee and enforce the covenant as reformed.") (emphasis added.); *GE Betz Inc. v. Moffitt-Johnson*, 301 F. Supp. 3d 668, 687 (S.D. Tex. 2014), aff'd in part sub nom. *GE Betz, Inc. v. Moffitt-Johnston*, 885 F.3d 318 (5th Cir. 2018) ("Once a restrictive covenant has been held to be unreasonable, courts generally must reform the covenant to make it valid.").

(12)   Even if a covenant not to compete is required to be reformed, injunctive relief is available to the party seeking enforcement. Tex. Bus. & Com. Code Ann. § 15.51(c).

### Dr. Kavcic Likewise Breached the Letter Agreement Under California Law

(13)   California similarly applies a four-part test for breach.  "The standard elements a plaintiff must satisfy to prove breach of contract are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.' " *Bladeroom Grp. Ltd. v. Emerson Elec. Co.*, No. 5:15-CV-01370-EJD, 2018 WL 2021884, at * 1 (N.D. Cal. May 1, 2018) (quoting *Wall St. Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (2008)).

(14)   California courts recognize that an employee's duty of loyalty restricts that employee's ability to compete with his employer during the term of employment.  *Fowler v. Varian Associates, Inc.*, 196 Cal.App.3d 34, 41 (1987) ("California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" (quoting *Sequoia Vacuum Systems v. Stransky*, 229 Cal.App.2d 281, 287 (1964)).  Such duty similarly applied to Dr. Kavcic under the Letter Agreement.  *See Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007) ("an 'adviser may be subject to a fiduciary duty of loyalty....'").

(15)   "[A]n 'adviser may be subject to a fiduciary duty of loyalty even when the adviser is not acting as an agent.'").  *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 414 (2007) (quoting Rest.3d, Agency, § 1.01, com. c., p. 19.)

JOINT PRETRIAL STATEMENT

1    (16)   Termination of the Letter Agreement does not terminate Dr. Kavcic's obligation to

2    maintain the confidentiality of the information disclosed, nor does it cure a pre-termination breach.

3    *Burnett v. Conseco Life Ins. Co.*, 690 F. App'x 536, 537 (9th Cir. 2017); *Nuvasive, Inc v. Madsen*

4    *Med., Inc.*, No. 13CV2077 BTM(RBB), 2015 WL 10943609, at *5 (S.D. Cal. July 20, 2015); *see*

5    *Broadcom Corp. v. Emulex Corp.*, 2010 WL 11465478, at *4 (C.D. Cal. Apr. 5, 2010) ("agreement

6    not to disclose confidential and privileged information does not restrain [the promisor's] ability to

7    engage in a profession, trade or business.").

8    (17)   Confidential information essentially is information 'of either particular significance

9    or [that] which can be readily identified as either attorney work product or within the scope of the

10    attorney-client privilege [citations].'   It could include discussion of the party's 'strategy in the

11    litigation, the kinds of experts [the party] expected to retain, [the party's] view of the strengths and

12    weaknesses of each side, the role of each of [the party's] experts to be hired, and anticipated

13    defenses." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp.2d 1087, 1094 (N.D. Cal. 2004)

14    (quoting *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271, 279 (S.D. Ohio 1988) and *Mayer*

15    *v. Dell*, 139 F.R.D. 1, 4 (D.D.C.1991).)

16    (18)   Litigation strategy is protected from disclosure by the work product doctrine.   *See*

17    *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 580 (N.D. Cal. 2007).

18    (19)   An attorney's mental impressions and legal theories are privileged, confidential, and

19    safeguarded against disclosure.   *Upjohn Co. v. United States*, 449 U.S. 383, 101 S. Ct. 677, 66 L.

20    Ed. 2d 584 (1981) (citing *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385 (1947).

21    **Dr. Kavcic Likewise Breached the Covenant of Good Faith and Fair Dealing**

22    (20)   "The law implies in every contract a covenant of good faith and fair dealing." *Koehrer*

23    *v. Superior Court*, 181 Cal. App. 3d 1155, 1169, 226 Cal. Rptr. 820 (Cal. App. 4th Dist. 1986).

24    (21)   "The covenant is implied as a *supplement* to the express contractual covenants, to

25    prevent a contracting party from engaging in conduct which (while not technically transgressing the

26    express covenants) frustrates the other party's rights to the benefits of the contract." *Racine &*

27    *Laramie, Ltd. v. Department of Parks & Recreation,* 11 Cal. App. 4th 1026, 1031–1032 (1992); *see*

28

JOINT PRETRIAL STATEMENT

1   *Pasadena Live v. City of Pasadena*, 114 Cal. App. 4th 1089, 1093 (Cal. App. 2d Dist. 2004) (The

2   covenant imposes "not only ... upon each contracting party the duty to refrain from doing anything

3   which would render performance of the contract impossible by any act of his own, but also the duty

4   to do everything that the contract presupposes that he will do to accomplish its purpose.").

5       **Dr. Kavcic Should Be Enjoined from Serving As an Expert to CMU in the CMU**

6   **Litigation Even if the Court Finds That the Letter Agreement Is Unenforceable**

7       (22)   "Disqualification of an expert is warranted based on a prior relationship with an

8   adversary if: (1) the adversary had a confidential relationship with the expert and (2) the adversary

9   disclosed confidential information to the expert that is relevant to the current litigation." *Hewlett-*

10   *Packard*, 330 F. Supp.2d at 1092-93; *see Oracle Corp. v. DrugLogic, Inc.*, No. C-11-00910 JCS,

11   2012 WL 2244305 (N.D. Cal. June 15, 2012); *Pellerin v. Honeywell Intern. Inc.*, 2012 WL 112539,

12   at *3 (S.D. Cal. Jan.12, 2012).

13       (23)   When evaluating the disqualification of an expert witness "the Court should consider

14   issues of fundamental fairness [citations] (asking whether the moving party was unduly

15   disadvantaged and the opposing party unduly advantaged), and whether any prejudice might occur

16   if an expert is or is not disqualified." *Hewlett-Packard*, 330 F. Supp.2d at 1094-95. "Thus, the

17   Court may ask not only whether there is the appearance of a conflict of interest, but also 'whether

18   another expert is available and whether the opposing party will be unduly burdened by having to

19   retain a new expert.'" *Id.* (*quoting United States ex rel., Cherry Hill Convalescent Ctr., Inc.*, 994

20   F.Supp. 244, 251 (D.N.J. 1997)).

21       (24)   "It is important to consider other policy concerns in order to achieve the goal of

22   protecting the integrity of the adversary process and of promoting public confidence in the legal

23   system. Such concerns include consideration of the parties' strategic positions, [citations], and

24   avoidance of creating 'troublesome incentives for both experts and the retaining party." *Hewlett-*

25   *Packard*, 330 F. Supp.2d at 1094-95 (quoting *Pinal Creek Group v. Newmont Mining Corp.*, 312

26   F.Supp.2d 1212, 1227 (D. Ariz. 2004)).

27

28

JOINT PRETRIAL STATEMENT

(25)  "For example, if experts are permitted to breach confidentiality agreements, they might be motivated 'to sell their opinions to the opposing parties or the highest bidder without concern about the potential confidentiality of their previous consultations.'" *Id.*

(26)  The "risk is too great" that a consulting expert who received confidential information will use the information, even inadvertently, to the harm the adverse party. *Nike, Inc. v. Adidas Am. Inc.*, 9:06-CV-43, 2006 WL 5111106, at *3 (E.D. Tex. Sept. 29, 2006); *Godo Kaisha IP Bridge 1 v. Telefonaktiebolaget LM Ericsson*, 2:21- CV-00213-JRG [Dkt. No. 79] 7 (E.D. Tex. Mar. 15, 2022).

(27)  A former employee who possesses confidential information about the relevant technology is disqualified from serving as an expert for an adversary, because it was unrealistic to believe that former employee could parse his knowledge of the confidential information he had obtained and only rely the information provided in litigation.  *Pellerin*, 2012 WL 112539 at *3; *Oracle Corp.*, 2012 WL 2244305.

**v.**    **Stipulations**

**Plaintiff's Motion in Limine No. 2 to Exclude Evidence and Documents Not Disclosed in Discovery:**

Documents and other evidence not disclosed during discovery are precluded from evidence at trial.  This agreement does not include exhibits used on cross examination for purposes such as impeachment or publicly available documents.

**vi.**    **Bifurcation**

**Dr. Kavcic's Statement:**

Dr. Kavcic believes that bifurcation of his declaratory relief claim and the counterclaims would be the most efficient use of judicial resources.  Dr. Kavcic would request that the issue of whether the letter agreement on its face bars Dr. Kavcic from participating in the CMU v. Broadcom litigation should be decided on its own.  A ruling as to this first question may eliminate the need for a second phase of trial to determine if there was a breach of the letter agreement.

**Broadcom's Statement**:

Broadcom believes that the entirety of the dispute between the parties should be resolved in a single trial.  Dr. Kavcic brought this action for a declaratory judgment of non-breach of the Letter Agreement.  Resolution of Dr. Kavcic's claim necessarily requires resolution of the breaches alleged in Broadcom's counterclaims.   In addition, the provision in the Letter Agreement that bars Dr. Kavcic from assisting CMU in the CMU Litigation is intertwined with his confidentiality obligation, *i.e.*, a finding that he has violated his confidentiality obligation supports barring his as a consultant for CMU.  Bifurcation is thus not feasible.

### vii.    Defendant's Unopposed Request for an Order Pursuant to FRE 502(d)

Defendant Broadcom requests an order pursuant to Federal Rule of Evidence 502(d) that disclosure of Dr. Kavcic's and KTS's communications in connection with this litigation does not waive the privilege attached to them.  "A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court — in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Ev. 502(d).  Dr. Kavcic has already seen this information, and both Broadcom and Dr. Kavcic's counsel in this case agree that disclosure here is not a waiver of privilege.

Such an order is necessary because K & L Gates, representing CMU and UMN in their respective litigations against LSI, contends that disclosing the substance of LSI's counsel's communications with Dr. Kavcic pursuant to the Letter Agreement in connection with the trial of this matter may waive privilege in such communications.

### viii.    Trial Briefs

**Dr. Kavcic's Statement:**

Dr. Kavcic has submitted a trial brief comporting with Judge James Donato's Standing Order for Civil Jury Trials.  *See* Dkt. No. 122.

**Broadcom's Statement:**

Although it is unclear a trial brief is required, Broadcom has submitted a trial brief in view of Plaintiff's position.  *See* Dkt. No. 126.

JOINT PRETRIAL STATEMENT

### ix.    Motions in Limine

The parties have exchanged four motions in limine: (1) Dr. Kavcic's Motion in Limine to Exclude Testimony of Edward J. Mayle; (2) Dr. Kavcic's Motion in Limine to Exclude Undisclosed Evidence and Documents; (3) Broadcom's Motion in Limine No. 1 to Exclude Evidence, Testimony, and Arguments Regarding the Substance of Dr. Kavcic's Privileged Communications; and, (4) Broadcom's Motion in Limine No. 2 to Exclude Evidence, Testimony, and Arguments Disputing That Dr. Kavcic Engaged in Privileged and Confidential Communications with Broadcom's Litigation Counsel.

The parties conferred and agreed to stipulate to Dr. Kavcic's Motion No. 2.  With respect to Dr. Kavcic's Motion No. 1, Broadcom does not intend to call Mr. Mayle as a witness in its case-in-chief, but reserves the right to call him as a rebuttal witness.

### x.    Settlement

The parties have reengaged with Magistrate Judge van Keulen, and are continuing to work towards a resolution.  As a compromise, Broadcom has agreed that Dr. Kavcic may be represented by K & L Gates in connection with his testimony as a fact witness in the CMU Litigation and may act as a consultant in matters pertaining to the validity of his patents.

### xi.    Damages

**Broadcom's Statement**:

For its counterclaims of breach of contract and breach of the covenant of good faith and fair dealing, Broadcom seeks declaratory relief in the form of an order declaring the Broadcom be awarded damages in an amount as yet to be determined, including fees and expenses associated with the defense of the CMU Litigation, which is pending but presently stayed pending resolution of this case, as well as any judgment, damages, settlement, awards, or any other liability arising from CMU's claims in the CMU Litigation. The damages also include fees and expenses associated with the defense of the UM Litigation as well as any judgment, damages, settlement, awards, or any other liability arising therefrom.  (JTX2, Apr. 11, 2022 Defendant's Responses & Objections to Plaintiff's 1st Set of Interrogatories (Nos. 1-13)).  In the alternative, Broadcom seeks nominal damages.

1

  **xii.**  **Anticipated Testimony**

2

**Broadcom's Statement**:

3

  (1)  Dr. Aleksandar Kavcic.

4

  (2)  By Rule 45 subpoena, a witness from Carnegie Mellon University with respect to

5

certain disputed fact issues.  CMU has intervened in this case, and maintains a campus

6

in Silicon Valley.

7

  **xiii.**  **Estimate of Trial Length**

8

  The parties agree that a bench trial in this matter can be concluded in no more than two trial

9

days.

10

  **xiv.**  **Choice of Law / Applicability of Non-Compete State Laws**

11

**Dr. Kavcic's Statement:**

12

  As set forth below, Plaintiff Dr. Kavcic states in this diversity action, with no choice of law

13

provision in the Letter Agreement, California law must apply.  And since California law applies,

14

the non-compete language is void.

15

  "Ordinarily, a federal court exercising diversity jurisdiction must apply the substantive law

16

of the state in which the court sits, except in matters governed by the U.S. Constitution or federal

17

statutes." *Stryker Sales Corporation v. Zimmer Bioment, Inc*. 231 F. Supp 3d 606, 614 (E.D. Cal.

18

2017) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  In the instant action, Dr. Kavcic

19

brought this declaratory relief action, in this Court on diversity grounds as he is a resident of Texas

20

and Defendant Broadcom Corp. is a resident of the State of California.

21

  In California, Courts apply a three-step governmental interest analysis where there is no

22

choice of law provision.  As the Court in *Stryker Sales Corporation* stated:

23

    "First, the court determines whether the relevant law of each of the
potentially affected jurisdictions with regard to the particular issue in question

24

is the same or different. Second, if there is a difference, the court examines each
jurisdiction's interest in the application of its own law under the circumstances

25

of the particular case to determine whether a true conflict exists. Third, if the
court finds that there is a true conflict, it carefully evaluates and compares the

26

nature and strength of the interest of each jurisdiction in the application of its
own law "to determine which state's interest would be more impaired if its

27

policy were subordinated to the policy of the other state*," Bernhard v. Harrah's*

28

*Club*, 16 Cal.3d 313, 320, 128 Cal.Rptr. 215, 546 P.2d 719 (1976), and then ultimately applies "the law of the state whose interest would be the more impaired if its law were not applied." *Stryker Sales Corporation,* 231 F. Supp. 3d 606, 619.

### A.   Whether Texas Law is Contrary to a Fundamental Policy in California

Treatment of non-compete agreements is materially different in California and Texas. California prohibits contracts that restrain someone from engaging in a lawful profession, with few exceptions.  Cal. Bus. & Prof. Code § 16600.  Texas enforces covenants not to compete so long as the restraints are reasonably limited in time, scope, and geographical area, and not greater than necessary to protect the business interests of the promisee.  Tex. Bus. & Com. Code Ann. § 15.50(a).

California law categorically rejects the validity of contracts in restraint of trade. "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal. Bus. & Prof. Code Ann. § 16600. California courts apply Section 16600 strictly. *See Golden v. Cal. Emerg. Physicians Med. Grp.*, 782 F.3d 1083, 1091 (9th Cir. 2015) (hereinafter, "*Golden I*") ("The California Supreme Court's most recent statement on section 16600 underscores how strictly the state understands the statutory proscription on professional restraints."). Moreover, Section 16600 applies "to a larger category of contracts than simply" "contracts concerning employment" or "those where the parties agree . . . to refrain from carrying on a similar business within a specified geographic area[,]" with its "prohibition extend[ing] to any restraint of a substantial character, no matter its form or scope." *Id.* at ¶ 1092.

"[A] contractual provision imposes a restraint of a substantial character if it significantly or materially impedes a person's lawful profession, trade, or business."  *Golden v. Cal. Emerg. Physicians Med. Grp.*, 896 F.3d 1018, 1024 (9th Cir. 2018) (hereinafter, "*Golden II*"). This standard is "undemanding," and can be met "even if [the restraint] is reasonable, . . . and even if it is narrow." *Golden II*, 896 F.3d at 1023. "[I]t will be the rare contractual restraint whose effect is so insubstantial that it escapes scrutiny under section 16600." *Id.* at 1024.

In determining an agreement's validity under Section 16600, the only inquiry is "whether the challenged provision restrain[s anyone] from engaging in a lawful profession, trade, or business

of any kind." *Golden I*, 782 F.3d at 1092 (internal quotations omitted) (alterations in original). Here, Paragraph 8 of the Letter Agreement on its face purports to restrain Dr. Kavcic from "engaging in a lawful profession, trade, or business"—*i.e.*, "assisting" or consulting with a range of third parties in connection with his field of expertise.

Courts have found such restrictions to be void under Section 16600. *See, e.g.*, *Golden II*, 896 F.3d at 1025-26 (finding void provision that impacted plaintiff's "current and future" work at "third-party facilities"). Section 16600 is categorical, and not subject to a "rule of reason" that would permit tailored restraints. *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 293 (Cal. 2008) ("Section 16600 is unambiguous, and if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect."); *Golden I*, 782 F.3d at 1091 n.4 ("California's stringent rule departs from the more traditional approach of the common law, which recognized a 'rule of reasonableness' with respect to covenants not to compete and other similar contractual restraints.").

It is clear from the discussion above that there is a fundamental difference in how California and Texas view non-compete clauses.

**B.   Whether California's Interests Are Materially Greater Than Those of Texas and Would Be More Seriously Impaired if Its Laws Were Not Applied.**

Besides Dr. Kavcic maintaining residency in Texas, there is no further connection to the state. California's interest is greater than that of Texas. A corporate defendant "shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. § 1391(c)(2). Here, Broadcom is headquartered in California, the UMN Litigation in connection with which Dr. Kavcic consulted for Broadcom is in the Northern District of California, and the CMU Litigation, with which Dr. Kavcic's patents are at issue (giving rise to the dispute here), is in California.

As of January 1, 2024, California has strengthened its public policy regarding enforcement of void contracts. Section 16600.5 of the Business and Professions code maintains that "any

JOINT PRETRIAL STATEMENT

contract that is void under this chapter is unenforceable regardless of where and when the contract was signed." Cal. Bus. & Prof. Code Ann. § 16600.5(a).

Both the location and the subject matter of the Letter Agreement are intimately linked to California. Again, the only connection this case has to Texas is Dr. Kavcic's residency—a place he was not even physically located at the time he signed the Letter Agreement.  For the reasons stated above, applying Texas law would undermine California's long standing public policy on enforcement of non-compete clauses in favor of adopting a fringe forum's law.  California law applies to the agreement and the non-compete clause should be rendered void.

**Broadcom's Statement:**

### A.   The Letter Agreement Is Governed by Texas Law

"When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). California employs the "governmental interest" approach, which involves three steps: first, the court determines whether the relevant law of each of the potentially affected jurisdictions is the same or different.  *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006). Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.  *Id*.  Third, if there is a true conflict, the court compares the nature and strength of each jurisdiction's interest in the application of its own law "to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state.  *Id*.  The court must "appl[y] the law of the state whose interest would be the more impaired if its law were not applied."  *Id*.

First, if the provision in the Letter Agreement is treated as a covenant not to compete (which it should not as discussed below), there is a difference in California and Texas law. The former generally prohibits contracts that restrain someone from engaging in a lawful profession (Cal. Bus. & Prof. Code § 16600), whereas Texas enforces covenants not to compete so long as they are reasonably limited in time, scope, and geographical area, and not greater than necessary to protect the business interests of the promisee.  Tex. Bus. & Com. Code Ann. § 15.50(a).

20-cv-01246-JD

1        With respect to factor two, "in a contract dispute where the parties have made no effective

2 choice of law, California courts analyze 'relevant contacts' to appraise the governmental interests

3 implicated in the action. [citation omitted]. Relevant contacts include (1) the place of contract

4 formation; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject

5 matter of the contract; and (5) the residence or place of incorporation and place of business of the

6 parties." *Edwards v. U.S. Fid. & Guar. Co.*, 848 F. Supp. 1460, 1465 (N.D. Cal. 1994).

7        These five sub-factors demonstrate that Texas has a greater interest here. Dr. Kavcic has

8 been a resident of the state of Texas since prior to at least November 5, 2016, before the agreement

9 was made. (JTX84 at 22). To the extent there was any negotiation, it was between Dr. Kavcic and

10 Broadcom's outside counsel based in Colorado. Although Dr. Kavcic believes he was in Hawaii

11 when he performed the work, he was a resident of Texas when the contract was formed and during

12 the entire period of performance.  (JTX85, at 6:22-7:10). Dr. Kavcic has never been a resident of

13 California, has no real property or bank accounts in California, has never been employed by any

14 employer within California, and has no other business or financial ties with California.  (JTX85, at

15 7:24-8:21). And Dr. Kavcic never travelled to California to perform any work under the agreement.

16 (JTX85, at 24:1-21). In addition, the UMN case was at the time pending in the District of Minnesota.

17        That Broadcom maintains physical locations in California is not controlling. First,

18 Broadcom is incorporated in Delaware. In addition, a corporation's California residence is not alone

19 enough to trigger application of California law. For example, in *Edwards v. U.S. Fid. & Guar. Co.*,

20 848 F. Supp. 1460 (N.D. Cal. 1994), *aff'd*, 74 F.3d 1245 (9th Cir. 1996), a California resident sued

21 her California-based employer for rescission of an offer to transfer to the company's Baltimore

22 office. *Id.* at 1463-64. The court applied Maryland law, noting that "[plaintiff] was interviewed for

23 the position in Baltimore, the work was to be performed in Baltimore, all the individuals with whom

24 she was dealing were located in Baltimore, and [defendant] is incorporated in Maryland." *Id.* at

25 1465. The court held that "[t]he only contact the company had with California in this transaction

26 was the offer [plaintiff] received by telephone from Baltimore" and was "without more, [] too

27 tenuous to justify the application of California law." *Id.*

28

JOINT PRETRIAL STATEMENT

As to factor three, Texas has a greater interest in application of its own law that allows for covenants not to compete. First, as noted above, such covenants are expressly authorized by statute in Texas. And the importance of Texas's interest in enforcing such covenants is highlighted by the fact that the statute expressly permits courts to reform covenants that are not reasonably limited in time, scope, and geographic area. Tex. Bus. & Com. Code Ann. §15.51(c). In contrast, California's interest is minimal because the policy behind § 16600 is to protect citizens of California. *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 946 (2008) ("The law protects Californians and ensures 'that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.'") (citation omitted). Dr. Kavcic has never been a citizen and has no ties to California.

**B.   The Letter Agreement Is Not Governed By State Laws Regarding Non-Compete Clauses**

Defendant has not located any authority applying either state's laws regarding covenants not to compete to a similar litigation consulting arrangement. Even if Texas's applicable laws apply, as noted above, Texas enforces such covenants so long as they are reasonably limited in time, scope, and geographical area, and not greater than necessary to protect the business interests of the promisee. With respect to California law, Dr. Kavcic was a full-time professor at the time of the agreement, and does not allege that he was impeded in his ability to practice his profession, which should end the inquiry. *See Whitewater W. Industries, Ltd. v. Alleshouse*, 981 F.3d 1045, 1056 (Fed. Cir. 2020) ("threshold ground for application of § 16600" is "evidence of a restraining effect on [plaintiff's] ability to engage in his profession"); *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-CV-04238-MMC, 2021 WL 2308277, at *3 (N.D. Cal. June 4, 2021) (party challenging covenant must "submit[] evidence clearly demonstrating enforcement of such provision would result in a prohibited restraint."). That § 16600 does not apply here is consistent with case law refusing to strictly apply the statue outside the context of termination of employment or sale of a business. *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130, 1158-69 (2020) ("[P]recedent construing section 16600 and its predecessor statute reveals that we have long applied a reasonableness standard to contractual restraints on business operations and commercial dealings."). In any event, Dr. Kavcic

JOINT PRETRIAL STATEMENT

1   has not pursued any other litigation consulting arrangements since, nor has plans to do so.  (JTX85,

2   Mar. 15, 2023 Tr. at 16:8-22; 68:10-15).

3        Moreover, the intent of the provision is to ensure Broadcom's confidential and privileged

4   information is protected from disclosure and misuse, which is further reason section 16600 is

5   inapplicable. California's state courts have repeatedly explained that "agreements designed to

6   protect an employer's proprietary information do not violate section 16600." *Fowler v. Varian*

7   *Assocs., Inc.*, 196 Cal. App. 3d 34, 44 (Ct. App. 1987); *Fields v. QSP, Inc.*, 2012 WL 2049528, at

8   *9 (C.D. Cal. June 4, 2012) ("§ 16600 does not invalidate an agreement between an employer and

9   employee that seeks to maintain the confidentiality of an employer's trade secret or other proprietary

10  information.") (collecting cases).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT PRETRIAL STATEMENT

Date:  January 29, 2024

Respectfully submitted,

CLARK HILL LLP

By: /s/ *Georges A. Haddad*
Georges A. Haddad
Attorney for Plaintiff

MCKOOL SMITH P.C.

By: /s/ *Steven Rizzi*
Steven Rizzi
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of January 2024, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then be sent Electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and electronic copies will be sent by electronic mail to any counsel of record indicated as non-registered participants.

Dated: Janauary 29, 2024

/s/ *Steven Rizzi*
Steven Rizzi

20-cv-01246-JD

JOINT PRETRIAL STATEMENT